Peter G. ZAMARELLO, Appellant,

v.

Nick YALE, Appellee.

No. 1731.

Supreme Court of Alaska.

Sept. 24, 1973.

John K. Norman and James D. Rhodes, Anchorage, for appellant.

Albert Maffei, Anchorage, for appellee.

Before RABINOWITZ, C. J., and CONNOR, ERWIN, BOOCHEVER, and FITZGERALD, JJ.

## OPINION

BOOCHEVER, Justice.

This appeal involves questions pertaining to a slander of title action. To clearly chronicle all the events would tax the talents of Euripides, but the following truncated accounts set forth the more salient facts.

In 1965, Nick Yale and Jerry Mulenos jointly purchased a 10-acre parcel of real estate on Dimond Boulevard in the Greater Anchorage Area Borough, Alaska.[1] Subsequently, Yale obtained a default judgment against Mulenos on an unrelated claim and purchased his one-half interest in the property at an execution sale. Following expiration of the one-year redemption period, Yale was issued a deed to the property in April 1969.

Subsequently, Peter G. Zamarello, on behalf of Mulenos, retained an attorney to investigate the possibility of Mulenos' recovering his interest in the property. As a result, on May 23, 1969, a complaint was filed on Mulenos' behalf seeking to set aside the default and sale based upon certain alleged irregularities in the proceedings.

On May 25, 1970, a deed was recorded from Mulenos to Andrew Gialopsos, Nick Yale's brother; and on the following day, Zamarello's attorney recorded an earlier deed dated June 5, 1967, by which Mulenos had quitclaimed the property to Zamarello.

The next thread in this tangled skein was the filing of a complaint in intervention by Zamarello alleging an agreement with Mulenos whereby Zamarello would·

---

1. The purchase price was $20,000 with $5,000 as a down payment. On May 13, 1965, a deed of trust was executed requiring payments of the balance of the purchase price, $15,000, by installments of $125 per month including interest at six percent.

undertake to save Mulenos' interest in the property from Yale in exchange for a two-thirds share of that interest. The complaint alleged that the Mulenos quitclaim deed was delivered to Zamarello pursuant to that agreement. Zamarello alleged that the other quitclaim deed subsequently executed by Mulenos to Nick Yale's brother was the result of fraud and collusion. He requested the court to set the Gialopsos deed aside, to impose a constructive trust upon the property in favor of Zamarello for two-thirds of a one-half interest, and to award damages.

Yale answered the complaint in intervention and counterclaimed contending that by filing his quitclaim deed and a *lis pendens*, Zamarello had slandered Yale's title and deprived him of his right to transfer or convey the property, damaging him in a sum in excess of $3,000.

On March 24, 1972, 10 days before the case was tried, the Greater Anchorage Area Borough rezoned the property from an "unrestricted" to a "R–1A" designation. At the trial, testimony was offered to show that the rezoning together with the adoption of more stringent water and sewer regulations had restricted the use of the property and decreased its value to the extent of $5,000 per lot. Evidence was also introduced concerning various expenses incurred as a result of not being able to develop the lots as originally planned. Appellant objected to the introduction of evidence on the issue of damages when such damages had not been specially pleaded.

The case was tried to a jury with all parties present, including Mulenos. The case was submitted to the jury with written instructions and a special verdict. The jury found the following: that no agreement existed between Zamarello and Mulenos whereby they were to share in whatever was recovered; that Zamarello recorded or caused to be recorded a quitclaim deed purportedly from Mulenos to Zamarello at a time when Gialopsos and Yale were the sole owners of the property; that Zamarello knew at the time he recorded or caused to be recorded the quitclaim deed that he did not have an interest in the property; and that the recording of the quitclaim deed did cause damage to Yale and Gialopsos. The jury then awarded compensatory damages in the amount of $36,557 to Yale.

Before submission of the case to the jury, Zamarello moved for a directed verdict on the grounds that Yale had failed to plead special damages and that the recording of the deed and the *lis pendens* were privileged publications. Following the verdict, Zamarello moved for judgment N.O.V. He is appealing from the judgment on the counterclaim.

After the return of the verdict, the court granted Yale's motion for summary judgment upholding his title acquired as a result of the execution sale. No appeal has been taken from that judgment.

With reference to the award of damages on Yale's counterclaim, Zamarello contends that:

(1) the recording of the quitclaim deed and *lis pendens* were privileged, and thus could not be the basis for an action for damages;

(2) the recording of the quitclaim deed was not the proximate cause of the damages;

(3) Yale failed to plead and prove special damages, an essential requirement for recovery in an action for slander of title; and

(4) prejudgment interest should not have been awarded.

We find that the first issue is dispositive of this appeal.

An action for "slander of title" in essence arises out of an injurious falsehood.[2] It is based on an intentional interference

2. "Undoubtedly, the best and most inclusive name for the tort is that of 'injurious falsehood,' coined by Sir John Salmond, but it cannot be pretended that thus far the courts have seen fit to make any use of it." Prosser, Law of Torts 916 (4th ed. 1971).

with another's economic relations.[3] In this case, it is alleged that Zamarello filed his quitclaim deed and *lis pendens* in order to prevent Yale from transferring or conveying his property, thus causing him damage.

The jury was required to answer specific interrogatories and found among other things that at the time that Zamarello recorded the quitclaim deed, he did not have an interest in the property and that it was recorded "with the intent to cause the defendants Andrew Gialopsos and Nick Yale harm, or to interfere with their title and use of the land."

Although by his counterclaim Yale contended that both the quitclaim deed and *lis pendens* created the cloud on his title and caused him damage, in his brief on appeal he concedes that there was an absolute privilege to file the *lis pendens*. He apparently was under the erroneous impression that the only *lis pendens* filed pertained to the original Mulenos complaint. Actually, a second *lis pendens* setting forth Zamarello's claim to the property was filed on May 29, 1970, three days after the filing of the Mulenos-Zamarello quitclaim deed.

We agree that the filing of the *lis pendens* was absolutely privileged and could not be made the basis of a claim for slander or disparagement of title. In a closely analogous case, Justice Traynor held for the California Supreme Court:

> Thus, subdivision 2 of section 47 states the long-established rule that publications made in the course of a judicial proceeding are absolutely privileged, Gosewisch v. Doran, 161 Cal. 511, 513–515, 119 P.

656; Donnell v. Linforth, 11 Cal.App.2d 25, 28–29, 52 P.2d 937; Moore v. United States Fid. & Guaranty Co., 122 Cal. App. 205, 210, 9 P.2d 562; Rest., Torts, §§ 635–639, and the question presented therefore is whether a notice of *lis pendens* recorded as authorized by section 409 of the Code of Civil Procedure is a publication in the course of a judicial proceeding.

.  .  .  .  .  .

> Since "the effect of a *lis pendens* is to give constructive notice of all the facts apparent upon the face of the pleadings, and of those other facts of which the facts so stated necessarily put a purchaser on inquiry  \* \* \*." Harris v. Whittier Building & Loan Association, 18 Cal.App.2d 260, 266, 63 P.2d 840, 842, the recordation of a notice of *lis pendens* is in effect a republication of the pleadings. The disparagement of title arises, therefore, from the recordation of the notice of *lis pendens* as well as from the pleadings. The publication of the pleadings is unquestionably clothed with absolute · privilege, and we have concluded that the republication thereof by recording a notice of *lis pendens* is similarly privileged. (Footnote omitted.)[4]

Alaska, like California, has a statute authorizing the recording of a *lis pendens* in order to give notice of the pendency of an action which may affect title to or the right to possession of real property.[5] As stated by Justice Traynor:

> It would be anomalous to hold that a litigant is privileged to make a publication necessary to bring an action but that he

---

3. *Id.* at 917; Wham, Disparagement of Property, 21 Ill.L.Rev. 26 (1926); Comment, The Law of Commercial Disparagement: Business Defamation's Impotent Ally, 63 Yale L.J. 65, 69–74 (1953).

4. Albertson v. Raboff, 46 Cal.2d 375, 295 P. 2d 405, 408 (1956). The California statute conferring an absolute privilege on publication of judicial proceedings is in accord with the common law and affords no basis for distinguishing the case. *See, e. g.,* Stewart v. Fahey, 14 Ariz.App. 149, 481 P.2d 519, 520–521 (1971); Ramstead v. Morgan, 219 Or.

383, 347 P.2d 594, 600–601 (1959); Restatement of Torts §§ 587, 637–38 (1938). The rationale for such an absolute privilege in regard to the publication of pleadings is "the public interest in according to all men the utmost freedom of access to the courts of justice for the settlement of their private disputes." Restatement of Torts § 587, Comment *a* (1938).

5. AS 09.45.790 specifies:
   *Lis pendens.* In an action affecting the title to or the right of possession of real property, the plaintiff at the time of filing

can be sued for defamation if he lets any one know that he has brought it, particularly when ₍he is expressly authorized by statute to let all the world know that he has brought it. . . . (Citation omitted.)[6]

Thus, the publication of the *lis pendens* could not be made the basis for a claim for damages due to disparagement of title. We next need determine whether the quitclaim deed which was recorded three days earlier was similarly privileged.

In *Albertson,* it is stated at page 409:

If the publication has a reasonable relation to the action and is permitted by law, the absolute privilege attaches. See Rest., Torts, § 587; Youmans v. Smith, 153 N.Y. 214, 220, 47 N.E. 265; Kraushar v. Iavin, Sup., 39 N.Y.S.2d 880, 882–883; Zirn v. Cullom, 187 Misc. 241, 63 N.Y.S.2d 439, 440–441; Inselberg v. Trosty, 190 Misc. 507, 77 N.Y.S.2d 457, 458; cf. 39 A.L.R.2d 840–861. It therefore attaches to the recordation of a notice of *lis pendens,* for such a publication is permitted by law, and like other documents that may be filed in an action, it has a reasonable relation thereto and it is immaterial that it is recorded with the County Recorder instead of being filed with the County Clerk.

In examining the circumstances surrounding the filing of the quitclaim deed, similar considerations would appear to control. During the course of settlement negotiations between counsel in the original suit brought by Mulenos, Yale had his brother telephone Mulenos in an effort to settle the claim. As a result, Mulenos gave a quitclaim deed to the brother in consideration of $5,000, $1,000 to be paid down and the balance after completion of the lawsuit. Upon being advised of the filing of that deed, Zamarello filed his complaint in intervention and his counsel [7] filed the earlier quitclaim deed from Mulenos to Zamarello. Since any claim that Zamarello had to the property could have been defeated by the Mulenos-Gialopsos deed, the quitclaim deed to Zamarello became vital to his case. There would appear to be no logical reason why it should not be clothed with the same privilege as the *lis pendens.* It had a reasonable relation to the action and the filing of the deed was permitted by law.

A party to a private litigation . . . has an absolute privilege to disparage another's property in . . . the institution of or during the course and as a part of a judicial proceeding in which he participates if the disparagement has some relation thereto.[8]

The quitclaim deed had a direct relation to Zamarello's claim of an interest in the property. It was specifically referred to in the complaint in intervention. The recording of the deed under those circumstances takes on no additional significance from the recording of the *lis pendens* referring to Zamarello's claim.

Similarly, the recordation of a claim of mechanic's lien in conjunction with a pretrial proceeding to enforce it and the filing of a notice of recission as a preliminary to filing suit to cancel an assignment of an

---

the complaint, or afterwards, and the defendant, when affirmative relief is claimed, at the time of filing the answer, or afterwards, may record in the office of the recorder of the recording district in which the property is situated a notice of the pendency of the action, containing the names of the parties, and the object of the action or defense, and a description of the property affected in that district. From the time of filing the notice for record, a purchaser, holder of a contract or option to purchase, or encumbrancer of the property affected has constructive notice of the pendency of the action and of its pendency against parties designated by their real names.

6. 295 P.2d at 409.

7. A second attorney replaced Zamarello's original one who withdrew due to the conflict of interest which developed between Zamarello and Mulenos. A third firm represented Zamarello at the trial. Similarly, Yale's original attorney withdrew, allegedly as a result of the settlement negotiated with Mulenos which bypassed counsel for both parties, and different counsel represented him at the trial.

8. Restatement of Torts § 638 (1938).

oil lease have been held to be absolutely privileged. The filings of the documents were held to be authorized by law and related to the legal actions.[9]

Moreover, there is no contention that Yale was damaged during the three-day interval between the recording of the Zamarello quitclaim deed and the recordation of the second *lis pendens*. Since the *lis pendens* gave recorded notice of the Zamarello claim, any damages attributable to inability to convey, transfer or use the property would have been incurred whether or not the quitclaim deed was also recorded.[10]

Our conclusion is not intended to foreclose recovery by one who has been damaged due to the malicious filing of a lawsuit. An action for malicious prosecution is available based on favorable termination of the original suit, lack of probable cause of the claim asserted and malice on the part of the claimant.[11]

But Yale's counterclaim fails to set forth any such claim. Neither malice nor even knowledge of the alleged falsity is pleaded as required for a malicious prosecution claim. Nor were such issues submitted to the jury.

The jury did hold in answers to specify interrogatories that:

10. Do you find that Peter Zamarello, plaintiff in intervention herein, knew at the time he recorded or caused a quitclaim deed to be recorded, that he did not have an interest in the property? Yes.

11. Was the recording of the quitclaim deed recorded or caused to be recorded with the intent to cause the defendants Andrew Gialopsos and Nick Yale harm, or to interfere with their title and use of the land? Yes.

But the fact that Zamarello knew that he did not have an interest in the property was not tantamount to knowledge that he did not have a good faith claim to the property. The legal title to the property was admittedly held by Yale.

Similarly, the disjunctive finding of intent to cause Yale harm or to interfere with his title and use of the land could have been answered in the affirmative based on a good faith assertion of a claim to the property. The presentation of such a bona fide claim by Zamarello could be regarded as embodying an intent to interfere with Yale's title and use of the land. We cannot, therefore, regard the issues involved in a malicious prosecution suit as having been disposed of by the jury's findings.

We accordingly hold that the recording of the quitclaim deed was privileged and that the portion of the judgment awarding damages allegedly resulting therefrom must be reversed. Disposition of this issue makes it unnecessary to consider the other points raised on this appeal.[12]

Reversed.

9. Frank Pisano & Associates v. Taggart, 29 Cal.App.3d 1, 24–25, 105 Cal.Rptr. 414, 430 (1972) ; Pasadena Petroleum Corp. v. Hughes, 216 Cal.App.2d 666, 31 Cal.Rptr. 87 (1963).

10. Oddly, the title report secured by Yale, although referring to the original *lis pendens* and the quitclaim deed, failed to refer to the second *lis pendens*. This was apparently due to an oversight on the part of the title company.

11. Stewart v. Fahey, 14 Ariz.App. 149, 481 P.2d 519 (1971) ; Albertson v. Raboff, 46 Cal.2d 375, 295 P.2d 405, 410 (1956).

12. At the trial, Zamarello contended that special damages must be pleaded and proved in an action for slander of title. While we concur in this generally accepted rule, we believe that the trial court correctly applied principles of modern pleading by holding that the allegation in the complaint of damages due to inability to convey or use the property adequately alerted Zamarello to a claim for special damages. Our liberal discovery rules then afforded the opportunity to ascertain the details and limits of such claim so as to avoid surprise.