4 F.3d 986
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
In Re: Thomas D. QUINN and Danna R. Quinn, Debtors.
Thomas D. QUINN; Danna R. Quinn, Plaintiffs-Appellants,
v.
Allen H. NEUHARTH; Janet A. Neuharth, Defendants-Appellees.
 No. 92-2366.
 United States Court of Appeals,
Fourth Circuit.
 Argued: June 8, 1993.
Decided: August 23, 1993.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Albert V. Bryan, Jr., Senior District Judge. (CA-92-6-M, BK-90-11684-AB)
 Argued: Stephen Zak Chertkof, Kator, Scott & Heller, Washington, D.C., for Appellants.
 Robert F. Brooks, Sr., Hunton & Williams, Richmond, Virginia, for Appellees.
 On Brief: Joseph B. Scott, Kator, Scott & Heller, Washington, D.C., for Appellants.
 Paul E. Mirengoff, Jack R. Wilson, III, Hunton & Williams, Richmond, Virginia, for Appellees.
 E.D.Va.
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 Before NIEMEYER and HAMILTON, Circuit Judges, and GARBIS, United States District Judge for the District of Maryland, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 In this diversity action, the plaintiffs-appellants Thomas and Danna Quinn (the Quinns) brought an action in the United States Bankruptcy Court for the Eastern District of Virginia alleging, under Virginia law, claims of slander of title, abuse of process, intentional infliction of emotional distress, and intentional interference with contractual relations. After the case was transferred to the United States District Court for the Eastern District of Virginia, the district court granted summary judgment in favor of the defendants-appellees Allen Neuharth, and his daughter Janet Neuharth (the Neuharths), on the Quinns' claims of intentional infliction of emotional distress and intentional interference with contractual relations. The case proceeded to trial on the other two claims. After the Quinns presented their case, the district court granted a directed verdict in favor of the Neuharths on the remaining claims. The Quinns appeal. We now affirm in part, reverse in part, and remand for a new trial.
 
 
 2
 * The convoluted saga between these would-be Hatfields and McCoys has its beginning in the year 1986, when the Quinns purchased a fifty acre tract of land known as "Four Chimneys" located in Loudoun County, Virginia. The property adjacent to the east and south of Four Chimneys is a 115 acre horse farm, known as "Paperchase Farms," a farm purchased the previous year by the Neuharths.[1] From the time the Neuharths purchased Paperchase Farms, it was evident that they were interested in acquiring and coveted the property that comprised Four Chimneys.
 
 
 3
 For reasons not entirely clear from the record, in April 1986, the Quinns sued Allen Neuharth challenging the boundary between the two properties. As a result of this suit, the Neuharths and the Quinns agreed to a common boundary line. This agreement was memorialized in the form of a "Boundary Line Agreement." According to the Boundary Line Agreement, Four Chimneys and Paperchase Farms shared a common boundary in the form of two straight lines, one running southwest (south line) and the other running southeast (east line). The two agreed common boundary lines were based on the survey of Horace Jarrett (Jarrett survey). The Jarrett survey determined the south line of the common property line between Four Chimneys and Paperchase Farms to be a straight line 1301.11 feet in length. This measurement was a distance between two found iron pipes at each end of the south property line. The length of the east line of the common property line between Four Chimneys and Paperchase Farms, according to the Jarrett survey, was a straight line 1245.76 feet in length. This measurement was also a distance between two found iron pipes at each end of the east property line.[2]
 
 
 4
 Once a settlement was reached between the parties, any tensions that may have existed seem to have subsided. The parties thereafter remained social friends, and in fact, the Quinns continued to board their horses at Paperchase Farms and their daughter participated in Janet Neuharth's wedding.
 
 
 5
 In the spring and summer of 1986 and 1987, Thomas Quinn, a real estate developer by trade, worked on the Four Chimneys property, cleaning up, among other things, a cabin area and some underbrush, and removing the remnants of a derelict fence obscured by some underbrush near the property line. In addition to this work, Thomas Quinn also built a manure loading area for the Neuharths on their property. The record reflects that the Neuharths were, at that time, entirely pleased and satisfied with the quality of Thomas Quinn's work.
 
 
 6
 The parties' relationship began to sour in August 1988, around the time the Quinns subdivided the Four Chimneys property into five lots, creating the Quinn Family Subdivision. The Quinns retained one of these five lots (Lot 1) and conveyed the other four parcels (Lots 2, 3, 4, and 5) to themselves as trustees for their relatives. Only Lots 1 and 4 border Paperchase Farms. The Quinns hired John Schiller to survey the property and design the subdivision.
 
 
 7
 The Schiller survey used the same endpoints (the found iron pipes) as the Jarrett survey to fix the common boundary lines between the two properties. The length of the common boundary lines on the Schiller survey and the Jarrett survey differed only slightly. Schiller measured the straight line between the two found iron pipes along the south line at 1300.72 feet in length and the straight line between the two found iron pipes along the east line at 1245.38 feet in length. Thus, the distances between the fixed points on the east and south lines in the Schiller survey each differed from the distances in the Jarrett survey by about four inches.[3] The surveys also differed in another respect. The bearings of the Schiller survey differed slightly in seconds from the Jarrett survey. As a result, if one ignored the established monuments, i.e., the iron pipes, and calculated the boundary lines simply on the basis of the bearings in the two surveys, the Schiller survey reduced the size of Paperchase Farms (thereby increasing the size of Four Chimneys) by a pie-shaped piece of land which was four-and-one half inches at its widest, along the south line.
 
 
 8
 In connection with the creation of the Quinn Family Subdivision in June 1988, the Quinns built a driveway off U.S. Route 50 leading to the proposed homesite on Lot 1. Shortly thereafter, the Quinns began constructing a house on Lot 1. Thereafter, in order to provide electricity to the house, Virginia Electric and Power Company (VEPCO) ran an underground service line to the house on Lot 1. The underground cable crossed over the boundary line onto the Neuharths' property. The encroachment consisted of an underground cable and transformer box, just a few feet inside the east boundary line. In addition, the driveway constructed by the Quinns encroached upon the Neuharths' property.
 
 
 9
 In early 1989, Janet Neuharth asked Thomas Quinn when he was going to replace the derelict fence that the Quinns removed. Thomas Quinn responded that he intended to build a fence when he finished construction of the house on Lot 1 in Four Chimneys. The parties agreed at that time to share the cost of the fence. A short time later, Janet Neuharth came over with her husband, Joseph Keusch, and told Thomas Quinn she wanted him to build a fence along the property line at his sole expense. Quinn stated that the derelict fence that he removed was not serviceable, but nevertheless reiterated his agreement to pay for half the cost of the fence.
 
 
 10
 Knowing that the Quinns filed a subdivision plan and started construction of the house on Lot 1 in Four Chimneys, Janet Neuharth became concerned about what the land records in Loudoun County might reflect regarding the Boundary Line Agreement. In response to this concern, Janet Neuharth, accompanied by her attorney, Ruth Rosenberg, examined the land records and discovered that the Boundary Line Agreement was not referenced in the subdivision plan, and that the subdivision plan was based upon the Schiller survey as opposed to the Jarrett survey.[4]
 
 
 11
 About the time of her review of the land records and just prior to the transfer of Paperchase Farms from Allen Neuharth to Janet Neuharth, the Neuharths had a survey of Paperchase Farms performed by Dewberry & Davis (Dewberry & Davis survey). As a result of this survey, the Neuharths learned that the driveway built by the Quinns and the power line installed by VEPCO encroached upon their property. When the Neuharths notified the Quinns of these encroachments, Thomas Quinn cured the encroachments within a few weeks at no cost to the Neuharths. Shortly thereafter, in April or May 1989, the Neuharths built, at their expense (approximately $6,000), a fence along the east and south property lines.[5]
 
 
 12
 On May 5, 1989, Rosenberg, on Janet Neuharth's instructions, sent a demand letter to Thomas Quinn. That letter stated that "several weeks ago" Thomas Quinn had removed a fence from the area of the property line. The letter demanded four things from the Quinns: (1) move the driveway; (2) have VEPCO move the utility line; (3) construct a fence on the property line at the Quinns' sole expense; and (4) plant shrubs on the Quinns' side of the property line. At the time this letter was written, the driveway and VEPCO encroachments had been cured and the fence along the property line had been erected by the Neuharths.
 
 
 13
 On May 26, 1989, Robert Schwenger of Dewberry & Davis wrote the Neuharths' attorney, Ruth Rosenberg:
 
 
 14
 Summarizing our meeting Friday, May 26th, we looked at the Jarrett Survey for the Shepherd property (now Quinn), the subdivision plat for the Quinn property by Schiller, the Dewbery & Davis survey of the McKay property (now Neuharth), and the Boundary Line Agreement between Neuharth and Quinn.
 
 
 15
 I concluded, based on the bearings and distances shown on these surveys, that the Boundary Line Agreement, the Jarrett survey, and the Schiller plat substantially agree as to the location of the common property lines with the Neuharth property (the distances vary by four and one-half inches and the angle [of the south line] varies by fifty-seven seconds)....
 
 
 16
 It also appears that the Boundary Line Agreement, while shortening the common line between Neuharth and Quinn, which runs from Route 50 to the South (S 08 o 30 46 W, 1245.76 feet), did add a small triangular piece of land to the Neuharth property along Quinn's Southerly lines....
 
 
 17
 Please note that these conclusions were reached in the office based on information presented to me by you, and do not represent the results of a field survey to locate the Jarrett or Schiller corners which would be necessary to verify them.
 
 
 18
 (Joint Appendix (J.A.) 259).
 
 
 19
 In June 1989, the Neuharths sued the Quinns in state court, claiming $250,000 in compensatory damages and $1,000,000 in punitive damages. The suit alleged three claims: (1) trespass based upon the removal of the derelict fence; (2) breach of contract based upon the Quinns' failure to adhere to the mutually agreed upon Boundary Line Agreement; and (3) ejectment premised on the fact that some of the Quinns' construction activities (VEPCO line and the driveway) had crossed over the east boundary line. The parties then engaged in "settlement negotiations," which yielded no resolution of the lawsuit.
 
 
 20
 In August 1989, the Neuharths responded to the Quinns' interrogatories in the state court action. Interrogatory number three asked the Neuharths to "state with particularity how you determine that you have been damaged in the amount of $250,000...." The Neuharths responded:
 
 
 21
 The cost of the fencing is $5,924.91. The estimated cost to re-landscape is a minimum of $15,000. Other considerations are the values of time spent by Allen Neuharth, Janet Neuharth and Joseph Keusch in the numerous conversations with Thomas Quinn regarding the replacement of the fence, the removal of the Virginia Electric Power Company hotbox, the removal of the driveway and the re-landscaping and the loss of the use of the land misappropriated by the Quinns.
 
 
 22
 (J.A. 289).
 
 
 23
 In late 1989, the Quinns decided to move to Louisville, Kentucky in order for their daughter, Mackey, to attend a special school for dyslexic children. As a result, the Quinns began efforts to sell all their property holdings in Virginia. At that time, the Quinns owned not only Four Chimneys but a sixty acre detached parcel known as Fairhaven. Fairhaven does not share any common boundary with either Paperchase Farms or Four Chimneys and is located several miles away from both properties. At the time the Quinns decided to move, Thomas Quinn received final approval on a proposed subdivision plan for Fairhaven. All that remained for final recording of the Fairhaven subdivision was for Thomas Quinn to post a road bond. Arthur Walters, a mortgage banker, agreed to loan the Quinns the money to post the road bond.
 
 
 24
 In February 1990, Thomas Quinn had some financial difficulties. He discussed these problems with his lawyer, John Flannery, who volunteered to contact the Neuharths since they had a well known and ongoing interest in purchasing the house on Lot 1 in Four Chimneys.
 
 
 25
 On March 4, 1990, Dr. Thomas Drummond responded to a Washington Post advertisement and expressed interest in purchasing the house on Lot 1 in Four Chimneys. Dr. Drummond and his assistant, Sister Carla Przyvilla, came out to look at the property, and determined that it was suitable as a home to rehabilitate wayward clergy. All parties agreed on a $1.5 million purchase price, and eight days later, on March 12, 1990, Dr. Drummond returned to the property and signed a written contract to purchase Lot 1 in Four Chimneys. After Dr. Drummond's March 4 visit, Thomas Quinn called Flannery and told him not to proceed with negotiating a sale to the Neuharths because he had a deal with Dr. Drummond. Flannery and the Neuharths were social friends.
 
 
 26
 About this time, Janet Neuharth, vacationing in the San Francisco area, called Rosenberg and advised her that she too was represented by John Flannery. According to Rosenberg's notes of the conversation, Janet Neuharth indicated that she could get the Quinns' house for a "good price," presumably because she knew the Quinns were having financial difficulties and were eager to move to Louisville so that their daughter's special educational needs could be met.[6] The record reflects that because they were worried about an imminent sale of Lot 1 and believed that the filing of a lis pendens would block such a sale, the Neuharths filed a lis pendens on March 8, 1990 that applied to all five lots in Four Chimneys and also to the Fairhaven property.[7]
 
 
 27
 Dr. Drummond subsequently tried to negotiate directly with the Neuharths and Rosenberg in an attempt to resolve the state court action-thereby eliminating the lis pendens -between the Neuharths and the Quinns. During negotiations, the Neuharths and Rosenberg attempted to dissuade Dr. Drummond from purchasing Lot 1 in Four Chimneys. During one conversation with Janet Neuharth, Dr. Drummond asked Janet Neuharth: "Why don't you just buy [Lot 1]?" (J.A. 176). Janet Neuharth responded that she would eventually end up with it.
 
 
 28
 In addition to the Dr. Drummond sale, the Quinns had several potential sales for the property pending at the time the lis pendens was filed. Robert Rupert had agreed to purchase Fairhaven for $1.45 million as soon as the road bond was posted and the final subdivision plan was recorded. In addition, there were other persons who had expressed interest in purchasing some of the Quinns' property, although negotiations had not been completed with any such interested parties. The record reflects that the lis pendens essentially prevented the Quinns from closing any of the sales. Specifically, the lis pendens prevented Walters from advancing the money necessary for the road bond on Fairhaven, thereby blocking the deal with Rupert.[8] The sale to Dr. Drummond fell through for similar reasons.
 
 
 29
 On May 17, 1990, Joseph Keusch hand delivered a letter to the Quinns from Allen Neuharth. The letter contained an offer to buy all five lots in Four Chimneys for 1.15 million dollars, less than half of its appraised value. That letter stated, in relevant part:
 
 
 30
 My offer has an approximate value of $1,500,000 as follows:
 
 
 31
 * $1,150,000 in cash for clear title to all of the real estate and existing buildings on the 50 acre Four Chimneys property, as is.
 
 
 32
 * Our withdrawal of the $275,000 lawsuit.
 
 
 33
 * Elimination of an approximately $75,000 realtor's fee, by a direct deal between the two parties....
 
 
 34
 I make this offer [to buy Four Chimneys] because I sincerely hope that you can afford foreclosure or bankruptcy so that you and Mackey can move on to your new lives....
 
 
 35
 If you reject the offer, I have no choice but to advise my lawyers to proceed with the lawsuit. They tell me that in the normal course of events that probably will take a year or more, during which time the lis pendens, of course, remains in effect.
 
 
 36
 (J.A. 251-52).[9] Thomas Quinn called Allen Neuharth and explained to him that he could not accept his offer for Four Chimneys because the balances due on the mortgages were in excess of the Neuharths' offer.[10]
 
 
 37
 Thereafter, the Quinns counterclaimed in the state court action, alleging, inter alia, that the inclusion of Fairhaven on the lis pendens constituted an abuse of process. The Neuharths' attorneys recommended to Janet Neuharth, an attorney in her own right, that the lis pendens should be amended to make no reference to Fairhaven. Instead of authorizing this action, Janet Neuharth instructed her attorneys not to amend the lis pendens until after she spoke with Allen Neuharth. The Neuharths' attorneys filed an amended lis pendens despite Janet Neuharth's instructions and the Neuharths' attorneys were fired shortly thereafter.
 
 
 38
 The Quinns filed bankruptcy on July 9, 1990. On September 27, 1991, the Neuharths voluntarily dismissed their pending state court action against the Quinns. On January 31, 1992, the Neuharths voluntarily withdrew their bankruptcy claim.
 
 
 39
 The Quinns filed a complaint in the bankruptcy court for the Eastern District of Virginia against the Neuharths. This complaint alleged four claims: (1) abuse of process; (2) slander of title; (3) intentional interference with contractual relations; and (4) intentional infliction of emotional distress. The case was subsequently transferred to the United States District Court for the Eastern District of Virginia. On July 2, 1992, the district court granted summary judgment in favor of the Neuharths on the intentional interference with contractual relations and intentional infliction of emotional distress claims. A jury trial commenced on September 22, 1992, on the remaining claims. After the Quinns presented their case, the district court granted the
 
 
 40
 Neuharths' motion for a directed verdict on the Quinns' claims for slander of title and abuse of process. The Quinns appeal.[11]
 
 II
 
 41
 The standard for granting a judgment as a matter of law under Rule 50 is the same standard as that used for granting summary judgment. In discussing the relevant inquiry on motion for summary judgment and motion for judgment as a matter of law (formerly known as a motion for a directed verdict), the Supreme Court has stated: "the primary difference between the two motions is procedural.... In essence, though, the inquiry under each is the same: whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 25242, 251 (1986).
 
 
 42
 As with a summary judgment consideration, judgment under Rule 50 is appropriate only if there are no genuine issues of material fact. Charbonnages de France v. Smith, 597 F.2d 406, 413 (4th Cir. 1979). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Factual disputes that are irrelevant or immaterial are properly excluded from consideration. Id. The party seeking summary judgment has the initial burden to show absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). This burden does not require the moving party to show evidence that proves absence of a genuine issue of material fact, but only to point out its absence. Id. The responding party may not rest upon mere allegations or denials, Anderson, 477 U.S. at 248, and summary judgment is appropriate if the responding party fails to show the existence of an element essential to that party's case. Celotex, 477 U.S. at 322. A mere scintilla of evidence supporting the case is insufficient. Anderson, 477 U.S. at 252. The responding party is, however, entitled to have all reasonable inferences and questions of law resolved in his favor. Id. at 255.
 
 
 43
 Just as with a summary judgment motion, the district court can, and should, "consider the record as a whole." Williams v. Cerbonics, Inc., 871 F.2d 452, 458 (4th Cir. 1989); Hughes v. Halifax County School Bd., 855 F.2d 183, 185 (4th Cir. 1989). "If there is substantial[12] evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fair minded men in the exercise of impartial judgment could reasonably return a verdict for the nonmoving party," the court should deny the motion. Bettius & Sanderson, P.C. v. National Union Fire Insur. Co., 839 F.2d 1009, 1014 (4th Cir. 1988) (quoting Wyatt v. Interstate & Oceon Transport Co., 623 F.2d 888, 891 (4th Cir. 1980)).
 
 
 44
 * Under Virginia law, to establish a cause of action for slander of title, "the plaintiff must prove that the defendant maliciously published false words, which disparaged plaintiff's property causing the plaintiff to suffer special damages." Warren v. Bank of Marion, 618 F. Supp. 317, 320 (W.D. Va. 1985).
 
 
 45
 The district court held that the filing of the lis pendens was reasonable because "[a] boundary line dispute, even a small one, is in [the court's] view an appropriate cause for the filing of a lis pendens, because it does involve a claim or a possible claim or a cloud on a piece of property, albeit a small piece of property." (J.A. 238). The district court further held that the Quinns failed to establish the necessary degree of malice required to support a slander of title cause of action. On that score, the district court stated:
 
 
 46
 But even if the lawyers were wrong, and it is certainly arguable that they were, in determining that the lis pendens was appropriate on the Four Chimney lots, it is at worst an error in judgment, and falls far short of the malice, however defined, that is a requirement or component of a slander of title claim.
 
 Id.[13]
 
 47
 * The only disparagement in this case was the filing of the lis pendens without legal justification as to Lots 1 through 5 in Four Chimneys and as to Fairhaven. Stated differently, for the Quinns to succeed in their slander of title action-and indeed all their causes of action-they must demonstrate that the Neuharths had no justification for filing the lis pendens.[14] The Neuharths concede that there was no justification for the filing of the lis pendens against Fairhaven. However, they vigorously contest the justification for the filing of the lis pendens against Lots 1 through 5 in Four Chimneys.
 
 
 48
 To resolve whether the filing of the lis pendens was justified, we must determine whether there was in fact a boundary dispute because, under Virginia law, a lis pendens may be filed only when "the action in which the lis pendens is based seeks to establish an interest by the filing party in the real property described in the memorandum." Va. Code. Ann. Sec. 8.01-268(B). The Neuharths contend-and the district court agreed-that there was a legitimate boundary dispute, based upon the minuscule four and one-half inch difference in the metes and bounds descriptions of the two surveys. This, the district court opined, justified the filing of the lis pendens. The Quinns assert there was never a boundary dispute at all. The Quinns point to the fact that the Schiller survey and the Jarrett survey used the same endpoints-the found iron pipes-in measuring the east and south property lines. The Quinns also point our attention to the fact that all parties agree that the newly erected fence by the Neuharths ran along the east and south property lines.
 
 
 49
 The Quinns have the stronger argument. Before the Neuharths filed the lis pendens, they were aware that the Schiller and Jarrett surveys were substantially the same and within accepted surveying standards. In fact, and to restate, the surveys used the same iron pipes in the ground to determine the endpoints of the boundary lines. The two lines which connect the same set of iron pipes are identical lines, and thus, at the time the lis pendens was filed, the whereabouts of the property line was not in dispute-it formed two straight lines between iron pipes located on the property. Moreover, there was a newly erected fence running along the boundary line and the Neuharths candidly admitted they claimed no interest in any property on the other side of the fence. It follows that a reasonable juror could find that there was no boundary line dispute at all and that the Neuharths had no legal interest or claim in any property owned or claimed by the Quinns at the time the lis pendens was filed, and therefore, the Neuharths lacked legal justification for filing a lis pendens.[15]
 
 2
 
 50
 The malice required to prove slander of title is common law malice, i.e., whether the Neuharths knew that their statements were false or acted in reckless disregard of the truth or falsity of their claim. See, e.g., Restatement (Second) Torts Sec. 623A(b). There was ample evidence that the Neuharths knew they had no interest in any property owned or claimed by the Quinns. The Neuharths filed their state court action against the Quinns in June 1989, but waited until March 8, 1990 to file the lis pendens. The filing of the lis pendens occurred immediately after the Neuharths learned of the impending sale to Dr. Drummond and at a time when the pending lawsuit was ostensibly dormant. The lis pendens was filed at the same time Thomas Quinn informed Flannery not to proceed with negotiations for the sale of Lot 1 in Four Chimneys to the Neuharths because of his oral agreement with Dr. Drummond. Thus, the jury could easily conclude that the lis pendens was filed to block the imminent sale of Lot 1 in Four Chimneys and with knowledge that the filing was unjustified. Stated differently, there was sufficient evidence of malice, i.e., that the Neuharths maliciously filed the lis pendens with knowledge of the fact that they had no interest in any land owned or claimed by the Quinns.[16]
 
 B
 
 51
 Under Virginia law, abuse of process is defined as the wrongful use of process after it has been issued. Triangle Auto Auction, Inc. v. Cash, 380 S.E.2d 649, 650 (Va. 1989). The tort consists of two elements: "(1) the existence of an ulterior purpose; and (2) an act in the use of the process not proper in the regular prosecution of the proceedings." Id. (citing Donohoe Construction v. Mount Vernon Assoc., 369 S.E.2d 857, 862 (Va. 1988)); Mullins v. Sanders, 54 S.E.2d 116, 121 (Va. 1949). "[T]o sustain an action for abuse of process, proof of malice is not necessary as to the issuance of the process, but it is necessary to allege and prove the process, after being sued out, was maliciously misused or abused." Mullins, 54 S.E.2d at 121 (citations and internal quotes omitted). Examples of abuse of process include "a whip to force the payment of an alleged indebtedness," Mullins, 54 S.E.2d at 122 (citation omitted), or as a means of extortion. Glidewell v. Murray-Lacy, 98 S.E. 665, 669 (Va. 1919).
 
 
 52
 In this case, there is sufficient evidence in the record for a jury to conclude that the Neuharths did not use, or continue to use after its filing, the lis pendens "to notify prospective purchasers and encumbrancers that any interest acquired by them in property in litigation is subject to decision of court," Black's Law Dictionary 932 (6th ed. 1990), but rather as a means to force the Quinns to sell their property (Lots 1 through 5) at a price less than one-half its appraised value. From the May 17 letter from Allen Neuharth to Thomas Quinn, the Neuharths' malicious intent in blocking the Quinns from alienating Four Chimneys and Fairhaven, and the Neuharths unyielding desire to own Lot 1, the jury could reasonably conclude that the Neuharths were using the lis pendens as a means of extorting Four Chimneys for a price less than half its appraised value.[17]
 
 C
 
 53
 We now proceed to our review of the district court's grant of summary judgment in favor of the Neuharths on the Quinns' intentional interference with contractual relations claim.
 
 
 54
 Tortious interference with contractual relations occurs when a party "intentionally and improperly interferes with the performance of a contract between another and a third person." Chaves v. Johnson, 335 S.E.2d 97, 102 (Va. 1985). The elements of the tort are:
 
 
 55
 (1) [T]he existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.
 
 
 56
 Id. at 97.
 
 
 57
 The district court granted summary judgment on the Quinns' tortious interference claim on the basis that the contracts at issue were too speculative. On appeal, the Quinns point to three contracts and business expectancies that were intentionally interfered with by virtue of the filing of the lis pendens. The first is the sale of Lot 1 in Four Chimneys to Dr. Drummond. The second is the sale of Fairhaven to Rupert. The third is the sale of Lot 4 in Four Chimneys to Dr. Block. The Neuharths agree that the district court erred in holding that the contracts for the sale of Lot 1 in Four Chimneys and Fairhaven were too speculative. However, they argue that the filing of lis pendens was proper, and therefore, they did not "improperly interfere" with the contracts. In addition, the Neuharths argue that the intent element was not established. Finally, the Neuharths argue that the "Quinns were never able, either on motion or at trial, to present evidence that the Neuharths knew about the contracts or potential contracts when they recorded the lis pendens." Appellee's Brief at 33-34.
 
 
 58
 We agree with the Neuharths that the evidence as a whole, at the summary judgment stage and as developed at trial, was insufficient to create a jury issue as to whether the Neuharths had knowledge of the sale of Fairhaven or the business expectancy of the sale of Lot 4 in Four Chimneys. However, a jury issue was created with respect to the sale of Lot 1 in Four Chimneys to Dr. Drummond. There is evidence as discussed above that the Neuharths knew of the existence of the contract between the Quinns and Dr. Drummond and intentionally-and without justification-interfered with it by filing the lis pendens.[18]
 
 III
 
 59
 In summary, we reverse the district court's grant of a directed verdict in favor of the Neuharths on the Quinns' slander of title and abuse of process claims. We also reverse the district court's grant of summary judgment in favor of the Neuharths on the Quinns' intentional interference with the Dr. Drummond contract of sale claim, but affirm the district court's decision as it pertains to the other contracts claimed to have been intentionally interfered with. On remand, the issue of the Quinns' compensatory damages, if any, and the allowance of punitive damages, if any, on the abuse of process claim, are properly for the jury's determination.
 
 
 60
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR NEW TRIAL
 
 NIEMEYER, Circuit Judge, dissenting:
 
 61
 Because the legal descriptions of the properties involved differed between the Jarrett and Schiller surveys, litigation to resolve the dispute is, in my judgment, legally justified, regardless of the Neuharths' motives for filing the action. Similarly, because legal title to properties is involved, the action is properly the subject of a lis pendens notice. Since I would, therefore, affirm the judgment of the district court, I respectfully dissent.
 
 
 
 [1]
 For purposes of clarity, we shall refer to the Neuharths as owners of the property. Allen Neuharth purchased Paperchase Farms in May 1985. In April 1989, Allen Neuharth conveyed the property to his daughter, Janet Neuharth
 
 
 [2]
 The east and south boundary lines share a common iron pipe terminus
 
 
 [3]
 The two surveys differed because Schiller employed an electronic measuring device while Jarrett employed a chain and hand measuring device
 
 
 [4]
 The Schiller survey, illustrating the proposed subdivision, was necessary to permit the filing of the subdivision
 
 
 [5]
 The record is clear that all parties-including the surveyors-agree that the newly erected fence ran along the property line
 
 
 [6]
 From the evidence in the record, it would be within the jury's province to conclude that Flannery notified the Neuharths of the pending sale to Dr. Drummond. This may be inferred from Flannery's relationship with the parties, Janet Neuharth's statement to her lawyer that she too was represented by Flannery, and the fact that the lis pendens was filed just four days after the Drummond oral agreement was reached
 
 
 [7]
 The property description on the lis pendens read as follows:
 The property affected by the lis pendens is described as follows:
 Parcel A:
 
 
 [59]
 7941 acres, more or less, located on the eastern side of Virginia Route 831 in Merser District, Loudoun County, Virginia
 Parcel B:
 Lot 01: Quinn Family Subdivision, being 21.28839 acres, more or less, ... Lot 02: Quinn Family Subdivision, being 7.573917 acres, more or less, ... Lot 03: Quinn Family Subdivision, being 6.872827 acres, more or less, ... Lot 04: Quinn Family Subdivision, being 6.948712 acres, more or less, ... Lot 05: Quinn Family Subdivision, being 7.169999 acres, more or less....
 (J.A. 366).
 
 
 [8]
 Walters testified that he could not loan the Quinns the money for the road bond because in light of the lis pendens he could not get a clear title insurance policy
 
 
 [9]
 Interestingly, this letter valued the pending state court action at $275,000
 
 
 [10]
 The Neuharths' offer for all five lots in Four Chimneys was for an amount less than half of its appraised value
 
 
 [11]
 The Quinns do not contest the district court's grant of summary judgment to the Neuharths on their intentional infliction of emotional distress claim
 
 
 [12]
 Although the word "substantial" is used, it would not be correct to say that the burden to the responding party is greater under a Rule 50 motion. The Supreme Court specifically equated the Rule 50 standard with the summary judgment standard
 
 
 [13]
 The district court employed similar reasoning with respect to Fairhaven
 
 
 [14]
 The Neuharths contend that the filing of a lis pendens does not give rise to a cause of action for slander of title under Virginia law. The Virginia Supreme Court has not decided this issue. However, we find persuasive a district court opinion from the Western District of Virginia. In Warren v. Bank of Marion, 618 F. Supp. 317 (W.D. Va. 1985), the court held that a notice of lis pendens is subject to a qualified privilege and can be the basis of a cause of action for slander of title. Id. at 324-25. The Warren court reasoned:
 [T]he filing of a notice of lis pendens gives a creditor an opportunity to protect whatever interest he believes he may have in certain real estate during litigation by preventing the property from being taken by a bonafide purchaser for value. See Virginia Code Sec. 8.01-268 (1984). The one holding title to the property, on the other hand, deserves the protection of a legal disincentive against an ill willed creditor who, without justification, wishes to apply undue pressure by tying up the record owner's property with a notice of lis pendens for what could be a period of years. In holding a notice of lis pendens subject to a qualified privilege, the court is not placing any restraints on a creditor who in good faith wants to protect his potential legal interest, while at the same time allowing a land owner an opportunity to prove that she has been defamed and her property disparaged by the unfounded and malicious publication of another.
 Id. at 325. While some states have recognized an absolute privilege for a lis pendens, see e.g., Zamarello v. Yale, 514 P.2d 228, 230 (Alaska 1973); Woodcourt II Ltd. v. McDonald Co., 119 Cal. App.3d 245 (1981), the majority of states that have addressed the issue appear to have rejected an absolute privilege for the filing of a lis pendens. See e.g., Atkinson v. Fundaro, 400 So. 2d 1324, 1326 (Fl. App. 1981) (no privilege accorded to a lis pendens placed on property that was not at issue in litigation); Larson v. Zilz, 445 N.W.2d 699, 702 (1989) (Lis pendens ordinarily enjoys a qualified privilege, but where lis pendens was totally improper, it is not privileged at all.); Westfield Development Co. v. Rifle Investment Assocs., 786 P.2d 1112, 1116 (Colo. 1990) (qualified privilege); Vintage Homes, Inc. v. Levin, 554 A.2d 989, 994 (1989) (lis pendens not privileged because there was no agreement to purchase property). Thus, Warren is in accord with modern authority on this issue.
 
 
 [15]
 Summarizing in part the relevant testimony on this score: Janet Neuharth testified that neither she nor her father ever claimed any interest in the Quinns' property, (J.A. 49-50), and she also testified that she never claimed an interest in any property on the other side of the fence that the Neuharths erected in April 1989. Also of note, all of the claims-trespass, breach of contract, and ejectment-in the Neuharths' suit against the Quinns-were not claims involving an interest in property owned by the Quinns
 
 
 [16]
 With respect to Fairhaven, the jury could reasonably conclude that the Neuharths were attempting to put intense financial pressure on the Quinns by maliciously disparaging the Quinns' property through the filing of the lis pendens on not only the lots in Four Chimneys, but Fairhaven as well
 
 
 [17]
 We find no merit to the Neuharths' argument that a lis pendens does not constitute "process."
 
 
 [18]
 We have reviewed the Quinns' remaining assignments of error and find all but two to be without merit. First, the district court ruled that the Quinns would not be able to present evidence of general compensatory damages, including mental injury on their abuse of process claim. We believe the district court abused its discretion in refusing to admit this evidence. It is well established that claims for abuse of process support the full range of compensatory damages:
 Once the plaintiff's right is established, actual damages proximately caused can be recovered, including indirect losses such as injury to financial standing and intangible losses such as mental injury. Specific proof of intangible damages apparently has not been required as a prerequisite to an award if it is clear that such damages would accrue to a normal person. Punitive damages may also be recovered in appropriate cases.
 Prosser and Keeton on Torts (5th ed. 1984) Sec. 121 "Abuse of Process" at 900 (citations omitted). Second, we believe there was sufficient evidence of malice to allow the jury to decide whether punitive damages were warranted on the abuse of process claim. It follows that evidence of the Neuharths' net worth should be admitted for the purposes of calculating punitive damages.